# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF LOUISIANA
# MONROE DIVISION

| | |
|---|---|
| **BRADLEY WAYNE BERRY #430191** | **CASE NO. 3:22-CV-00397 SEC P** |
| **VERSUS** | **JUDGE DAVID C. JOSEPH** |
| **KIRT GUERIN** | **MAG. JUDGE KAYLA D. MCCLUSKY** |

## REPORT & RECOMMENDATION

Petitioner Bradley Wayne Berry, a prisoner in the custody of Louisiana's Department of Corrections proceeding pro se, filed this Petition for Writ of Habeas Corpus on approximately February 7, 2022, under Title 28, United States Code, Section 2254. [doc. #1]. Petitioner attacks his convictions for aggravated rape and indecent behavior with a juvenile, as well as the life imprisonment sentence imposed by the Fifth Judicial District, Richland Parish, State of Louisiana.[1] For reasons assigned below, **IT IS RECOMMENDED** that the Court **DENY** Petitioner's claims and **DISMISS** his petition, **WITH PREJUDICE**.

## Background

The Louisiana Second Circuit Court of Appeals recounted the facts and state procedural history as follows:

> The defendant, Bradley Berry, is the half-brother of C.B., one of the victims in this case. C.B.'s date of birth is August 2, 1997, and he was 15 years old at the time of the offenses. J.B., the other victim in this case, is the defendant's second cousin. J.B., whose date of birth is July 10, 1992, was 10 years old at the time of the offense.
> In March 2013, the defendant was released from prison and moved back home with his father. Approximately one week after the defendant's return home, C.B., who lived a short distance away, went to visit his father (J.W.B.) at the home his father shared with the defendant.

---

[1] This matter has been referred to the undersigned for review, report, and recommendation under Title 28, United States Code, Section 636, and the standing orders of the Court.

During the trial, C.B. testified as follows: he and the defendant went into a bedroom to listen to music; while in the bedroom, the defendant asked C.B. to show him the size of his penis; the defendant began performing oral sex on him; C.B. then performed oral sex on the defendant; the defendant apologized for ejaculating into C.B.'s mouth; the defendant told him, "I don't think it's wrong if we don't tell anybody"; the defendant asked C.B. to tell him "how [he] got Timothy off"; and, on another occasion, the defendant went to C.B.'s home and masturbated in C.B.'s presence then performed oral sex on him.

In August 2013, C.B. told his mother, R.M., about the sexual incidents, but begged her not to tell anyone because he was afraid that people would think he was "gay." Additionally, C.B. stated that he did not want the defendant to "go to jail for a long time." R.M. did not report the incidents at that time.

On April 14, 2014, R.M. went to the Richland Parish Sheriff's Office and reported that the defendant and Timothy had "messed with" C.B. An investigation ensued. Wanda Vallery, a sheriff's office investigator, interviewed R.M. and C.B.

On April 26, 2014, C.B. published a Facebook post about the sexual abuse. J.B. responded to the Facebook post in a private message, and the following messages were exchanged between C.B. and J.B.:

> J.B.: Sorry about that Cuz[;] I didn't know[.]
> C.B.: It's ok[.]
> J.B.: I know how you feel[;] believe me[.]
> C.B.: Really[?]
> J.B.: Yea[;] just never told anyone[;] embarrassed by it[.]
> C.B.: Oh[.]
> So what happened[?] If [you] don't mind[,] tell me[,] and if you don't want to[,] that's ok too[.]
> J.B.: *******UNABLE TO READ*******
> C.B.: Oh[.] I'm so sorry big man[.] [T]hat's terrible[.] How old were you[?]
> J.B.: About ten[.]

Subsequently, Investigator Vallery questioned J.B. about the comments he made on Facebook. J.B. informed Investigator Vallery that the defendant entered his bedroom "during the night," pulled his pants down and performed oral sex on him. J.B. was unable to recall the exact date of the sexual incident; however, he was able to recall that he was between 8 and 10 years old at the time. J.B. also stated that the incident occurred at J.W.B.'s home, where J.B. was living with his grandmother.

The defendant was arrested and charged by bill of indictment with the aggravated rape of J.B., in violation of La. R.S. 14:42, and indecent behavior with a juvenile with regard to C.B., in violation of La. R.S. 14:81.

Prior to trial, the state filed a notice of intent to use other crimes evidence, i.e., the defendant's 2000 conviction for carnal knowledge of a juvenile and his 2007 convictions for carnal knowledge of a juvenile and contributing to the delinquency of a juvenile. In response, the defendant filed a motion to exclude the

other crimes evidence, arguing that the prior convictions "involved facts and circumstances dissimilar to [those] present in this case." Following a hearing, the trial court denied the defendant's motion to exclude the evidence of other crimes. The court stated:

> [A]rticle 412.2 ... was enacted along with some of the case laws ... which indicate a lustful—lustful disposition toward children may be admissible and that would be considered for bearing on any matter which was relevant for the balancing test, and it does ... require the Court to do a balancing test and balance the prejudice against the defendant versus the probative value of the charges[.] *** I believe the probative value outweighs the prejudice because I can give an instruction which will instruct the jury ... that they're not to use this but only use it for the limited purpose of the other crimes evidence[.]

The defendant's trial commenced on December 14, 2015. During the trial, Investigator Vallery testified with regard to the investigation and her interviews with R.M., C.B., and J.B. She stated that C.B. provided her with the password to his Facebook account and she read the messages that C.B. and J.B. had exchanged. Investigator Vallery also testified that she printed the messages from Facebook and subsequently interviewed J.B. to obtain his statement.

On cross-examination, Investigator Vallery admitted that, in the Facebook post, J.B. stated that he was 10 years old when the aggravated rape occurred. However, during his interview, he recalled that the incident occurred when he lived with his grandmother, when he was between the ages of 8 and 10. Investigator Vallery further admitted that she did not attempt to collect any physical evidence of the rape. She explained that she did not attempt to do so because the rape had occurred approximately 10 years before it was reported.

During her cross-examination with regard to C.B.'s allegations, Investigator Vallery admitted that R.M. stated in her interview that only one sexual incident occurred between the defendant and C.B. However, she explained that the confusion may be attributable to the fact that R.M. was "telling me about Timothy and [the defendant] at the same time[.]" Further, Investigator Vallery testified that C.B. was able to "remember for sure" two sexual incidents involving the defendant and "possibly a third[.]" She stated that C.B. reported that the improper sexual encounters may have occurred "two or three times, but he specifically remembered those two incidences[.]" Additionally, Investigator Vallery testified that C.B.'s statements were the only "tangible proof" of the sexual encounters between him and the defendant.

At the time of the trial, C.B. was 18 years old. He testified as follows: the defendant moved back to the family's property in March 2013; at that time, the defendant lived in a house with J.W.B.; he (C.B.) lived nearby in a mobile home with his mother, stepfather and siblings; on the day the first incident of sexual abuse occurred, he went to the home to visit his father; his father and stepmother left to attend church; the defendant invited him into his bedroom to listen to music; as they listened to music, he asked the defendant, "Do you think [masturbating is] a sin?";

3

the defendant asked him, "How did you get Timothy off?"; shortly thereafter, the defendant asked, "Can I see how big yours is?"; he understood that the defendant was referring to his "private part"; he told the defendant, "Yes" and "pulled it out ... and he started sucking me and then I was ... sucking his private part"; the defendant ejaculated in his mouth and told him, "I'm sorry"; when he got ready to leave, the defendant told him, "I don't think it's wrong if you don't tell anybody"; the second incident occurred at his (C.B.'s) house; the defendant came to his house and they went into his bedroom; the defendant started playing with himself then began "messing with my private parts and then he started sucking my private parts and then I started sucking his, but I stopped"; the defendant told him "Don't tell anybody"; he does not recall a third sexual encounter involving the defendant; initially, he did not tell anyone about the sexual abuse and considered committing suicide; he finally decided to tell his mother "what happened with" the defendant and Timothy; he asked his mother not to "go to the police" because he "didn't really know what to do"; he was worried that "if [he] told it, [the defendant] would go to jail for a long time"; he eventually went to live with his aunt who "already knew about it"; his aunt asked "if it was true"; when he confirmed that the encounters occurred, his aunt persuaded him to report the incidents to the sheriff's office; he was interviewed by Investigator Vallery; he was 15 years old when the incidents occurred; he made a Facebook post about his feelings regarding the incidents; and J.B. responded that "the same thing" had happened to him.

      On cross-examination, C.B. testified as follows: during his interview with Investigator Vallery, he initially stated that the first sexual encounter with the defendant occurred at his home and the second incident occurred at the defendant's home; after the incidents, he continued to visit his father's home when the defendant was "off working"; and he recalled telling Investigator Vallery that he had two sexual encounters with the defendant and "numerous" encounters with Timothy.

      J.B. was 23 years old at the time of trial. He testified as follows: he was "kind of raised" by his grandmother at J.W.B.'s residence; during that time, the defendant lived "in and out of the house"; when he was "about ten years old," he awakened during the night to find the defendant in his bedroom "playing with [him], sucking on ... [his] penis"; he was asleep when the defendant entered the room, but he "woke up and [his] pants were down and [the defendant] was doing it"; the defendant did not say anything to him at the time; he believes he was 10 years old at the time of the incident because he remembers that he was in the fifth grade and that he had to get up for school the following day; he told C.B. about the incident with the defendant because C.B. "was going through a hard time" and he wanted to "try to give him a little support"; he did not tell anyone about the incident at the time because "[i]t was just kind of an embarrassment"; he saw the defendant "a lot" after the incident and he "just kind of acted like it never happened, went on about [his] life"; he never had a conversation with the defendant about the incident; and in 2007, he was present in the motel room when the defendant had sexual intercourse with his then–15–year–old female cousin.

      On cross-examination, J.B. testified that he was unable to recall the specific date the defendant raped him. He stated, "After you sit there for fifteen years and

4

try to block something out[,] I mean—you just might have a little trouble—you have to think about it a while." J.B. also testified that he was unable to recall how many people he spoke to about the rape since he revealed the incident to C.B.

Further, J.B. stated that he first told Investigator Vallery that he was eight or nine years old when the defendant committed the offense. J.B. reiterated that the offense occurred during the night. He stated, "I woke up and my pants were down and he was—had his mouth on my thing." Additionally, J.B. testified that he told Investigator Vallery that Timothy had done "the same thing that [the defendant] did[.]" Thereafter, J.B. testified that he was certain that it was the defendant, and not Timothy, who performed oral sex on him that night. He explained that although it was dark outside, he could see the defendant from the light shining through the window. Further, J.B. testified that he continued to see the defendant and would "hang out with him like nothing happened" because "it was just kind of an embarrassment to think about it, and you kind of hope a person wouldn't ever do that kind of stuff again[;] I mean it's your cousin you've always been around you know, you don't see them like that." Additionally, J.B. admitted that, other than his testimony, he did not have "any other kind of evidence or proof that [the rape] actually happened."

R.M., C.B.'s mother, also testified at trial. She stated that she recalled C.B. telling her about the sexual abuse shortly before his 16th birthday. She stated that C.B. told her that the defendant "made him" have "oral sex with him" on two occasions.

On cross-examination, R.M. testified as follows: she did not report the sexual abuse to the police department initially because C.B. "didn't want me to do it right then"; she told Investigator Vallery that the defendant had performed oral sex on C.B. on one occasion; she could not remember the exact month or day that C.B. told her about the incidents; and she never witnessed any sexual conduct between the defendant and C.B.

S.B., the brother of the defendant and the half-brother of C.B., testified as follows: in 2014, C.B. told him about the incidents with the defendant; he "very distinctly remember[s]" C.B. telling him that he was 14 years old when the incidents occurred; and the incidents could not have occurred because the defendant was incarcerated when C.B. was 14 years old.

On cross-examination, S.B. testified as follows: C.B. told him that the defendant had "fooled with" him on more than one occasion; he did not recall when the defendant returned home after being released from prison; he believed C.B. was "lying to the jury"; he did not tell the sheriff's office or the district attorney's office about his suspicions that C.B. was not being truthful; he was unaware that C.B. told Investigator Vallery that he was 15 years old when the incidents occurred; he believes J.B. is "a liar"; he believes the 15–year–old female relative with whom the defendant had sexual intercourse with was being truthful; and he believes Investigator Vallery was "absolutely" lying about the incidents.

A.B., S.B.'s wife, corroborated S.B.'s testimony that C.B. told them that he was 14 years old when the incidents with the defendant took place. She stated that C.B.'s statements "just sounded retarded" because she believed the defendant was incarcerated when C.B. was 14 years old. A.B. also testified that she believes the

5

defendant "is innocent" and could not have committed the crimes against C.B. On cross-examination, A.B. admitted that she did not inform law enforcement that the defendant was incarcerated and could not have committed the crimes against C.B. She also stated that she believes C.B. "was mistaken" about the allegations.

J.W.B., the father of the defendant and C.B., also testified that C.B. told him that he was 14 years old when the incidents occurred, and that the defendant was incarcerated during that year. On cross-examination, J.W.B. testified as follows: he talked to C.B. about the allegations at C.B.'s wedding in September 2015; he did not offer C.B. money and a truck to recant his statements against the defendant; he was not surprised by the nature of C.B.'s allegations, but he was surprised by the timing; he was not aware that C.B. told the investigator that he was 15 years old when the incidents occurred; he did not tell police officers or the district attorney's office that the defendant was incarcerated during the time C.B. alleged the abuse took place; he believes the defendant should "be punished" if he committed the acts against C.B. and J.B.; and he could not testify that either C.B. or J.B. was lying about the incidents.

C.B. was called to testify as a rebuttal witness. He testified as follows: he did not tell anyone that he was 14 years old when the defendant committed the acts; he was 15 years old when the incidents occurred; his father offered to give him a truck and partial ownership in a house in exchange for recanting his allegations against the defendant; his father approached him at his wedding in September 2015 and attempted to persuade him to "come up here and say none of this ever happened"; the first time the defendant performed oral sex on him occurred approximately one week after the defendant was released from prison in 2013; and the defendant was in prison when he (C.B.) was 14 years old.

C.B.'s wife testified that she was present in the vehicle during the conversation between C.B., S.B. and A.B. She stated that C.B. did not mention how old he was when the incidents occurred.

At the conclusion of the trial, the jury found the defendant guilty as charged. The trial court sentenced the defendant to life imprisonment at hard labor without the benefit of parole, probation or suspension of sentence for the aggravated rape conviction and seven years at hard labor for the indecent behavior with a juvenile conviction. The sentences were ordered to run concurrently.

*State v. Berry*, 51,213 (La. App. 2 Cir. 5/17/17), 221 So.3d 967, 968–76 (footnotes omitted).

On May 17, 2017, the Louisiana Second Circuit Court of Appeals affirmed Petitioner's conviction and sentence. *Id.* at 986. Petitioner subsequently filed a writ with the Louisiana Supreme Court, which was denied on December 17, 2018. *State v. Berry*, 2017-1146 (La. 12/17/18), 257 So.3d 967. Petitioner indicates he did not apply for certiorari before the United States Supreme Court. [doc. #16, p. 1].

On February 14, 2020, Petitioner filed an application for post-conviction relief before the trial court. [doc. # 16, p. 1]. On approximately January 26, 2021, the court denied Petitioner's application. [doc. #s 1-3, p. 78; 5, p. 3]. On July 15, 2021, the Louisiana Second Circuit Court of Appeals denied Petitioner's application for review of the trial court's ruling, "[o]n the showing made[.]" [doc. # 1-3, p. 78]. On November 23, 2021, the Supreme Court of Louisiana denied Petitioner's application for supervisory writ. *State v. Berry*, 2021-01248, 328 So.3d 81 (La. 11/23/21).

Here, Petitioner brings two claims: (1) his aggravated rape conviction is unconstitutional because he was not convicted by a unanimous jury, and (2) his indictment was "invalid/improper[.]" [docs. #5, pp. 5, 7; 16, p. 3].

On June 1, 2022, the Court directed the Clerk to prepare summonses and serve a copy of the petition on the Warden of Elayn Hunt Correctional Center, the Attorney General of the State of Louisiana, and the District Attorney for the Fifth Judicial District Court, Richland Parish, where Petitioner was convicted and sentenced. [doc. #19]. The Court ordered Respondents, through the District Attorney, to file an answer to the petition; a memorandum brief of law in support of all issues raised in the answer; a certified copy of the state court record, including transcripts of all proceedings held in state courts; certified copies of all documents filed in connection with any appeal; and certified copies or citations to all state court dispositions pertaining to the conviction under attack. *Id.*

On July 19, 2022, Respondents, through the District Attorney for the Fifth Judicial District Court, filed their response. [doc. #24].

On January 12, 2023, Petitioner filed a motion to supplement his petition. [doc. #27]. On January 13, 2023, the Court granted Petitioner's motion and provided 21 days for Respondents to file a response. [doc. #29]. Respondents filed a response on February 2, 2023. [doc. #30].

Accordingly, this matter is ripe.

## Discussion

I. *Standard of Review*

*Habeas corpus* relief is available to a person who is in custody "in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254. Under Title 28, United States Code, Section 2254(d), this Court must give deference to a state court decision for "any claim that was adjudicated on the merits in State court proceedings" unless the decision was either "contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the Supreme Court of the United States," or the decision "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)–(2).

A decision is "contrary to" clearly established federal law "'if the state court arrives at a conclusion opposite to that reached by . . . [the Supreme Court] on a question of law or if the state court decides a case differently than [the Supreme Court] has on a set of materially indistinguishable facts.'" *Williams v. Taylor*, 529 U.S. 362, 413 (2000); s*ee also Hill v. Johnson*, 210 F.3d 481, 485 (5th Cir. 2000), *cert. denied,* 532 U.S. 1039 (2001). An "unreasonable application" of clearly established federal law is one in which "the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." *Williams*, 529 U.S. at 413. "The focus of the latter inquiry is on whether the state court's application of clearly established federal law is objectively

8

unreasonable[.]" *Bell v. Cone*, 535 U.S. 685, 694 (2002) (citing *Williams,* 529 U.S. at 409–410) ("[W]e stressed in *Williams* that an unreasonable application is different from an incorrect one.").

Section 2254(d)(2) also allows for habeas relief if the state court's decision "was based on an unreasonable determination of the facts" in light of the record before it. The federal court "may not characterize these state-court factual determinations as unreasonable 'merely because [we] would have reached a different conclusion in the first instance.'" *Brumfield v. Cain*, 576 U.S. 305, 313–14 (2015) (quoting *Wood v. Allen*, 558 U.S. 290, 301 (2010)). "Instead, [Section] 2254(d)(2) requires that we accord the state trial court substantial deference." *Id.* at 314. However, the petitioner may overcome the presumption of correctness "by clear and convincing evidence." *Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) (citing 28 U.S.C. § 2254(e)(1)).

II. *Statute of Limitations*

Respondent argues that all of Petitioner's claims are untimely. [doc. #24-1, p. 5]. Petitioner appears to offer a tolling argument—his attempts to secure counsel to file his petition were unsuccessful, so he is proceeding pro se. [doc. #5, p. 13]. He also argues that he had no access to the law library for over two years because of the COVID-19 pandemic. *Id.* Thus, he argues his claims are timely.

Because the limitations issue is not jurisdictional, courts may bypass it and proceed to the merits of a Section 2254 action. *Ellison v. Dir.*, No. 3:22-cv-842, 2022 WL 2541684, at *3 (N.D. Tex. June 3, 2022) (citing *Davis v. Johnson*, 158 F.3d 806, 811 (5th Cir. 1998)), *R&R adopted*, 2022 WL 2533405 (N.D. Tex. July 7, 2022). Even where there may be reason to doubt compliance with the statute of limitations, the Court may proceed to the merits in the interest of judicial economy. *White v. Steele*, 853 F.3d 486, 590 (8th Cir. 2017). And, where a petitioner is not entitled to habeas relief on the merits, the court need not "attempt to untangle" procedural problems

9

posed by the statute of limitations. *Mays v. Davenport*, 560 F. App'x 958, 962 (11th Cir. 2014). Therefore, the Court will proceed to the merits of Petitioner's claims.

    III.    *Analysis of Claims*

Petitioner brings two claims: (1) his aggravated rape conviction is unconstitutional because he was not convicted by a unanimous jury, and (2) his indictment was "invalid/improper[.]" [docs. #5, pp. 5, 7; 16, p. 3]. The Court will consider each claim.

    a.  *Unanimous Jury*

Petitioner alleges that he was convicted of aggravated rape by an 11-1 vote of the jury, in violation of his constitutional rights. [doc. #5, p. 6].

Article I, Section 17 of the Louisiana Constitution provides that "[a] criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict." Similarly, Louisiana Code of Criminal Procedure Article 782 provides "[a] criminal case in which the punishment may be capital shall be tried before a jury of twelve persons, all of whom must concur to render a verdict. A case for an offense committed prior to January 1, 2019, in which the punishment is necessarily confinement at hard labor shall be tried before a jury of twelve persons, ten of whom must concur to render a verdict."

Petitioner was charged and convicted of aggravated rape, which is not a capital offense. *Eley v. Vannoy*, Civ. No. 20-2232, 2022 WL 4551376, at *8 (E.D. La. Sept. 29, 2022); *see also Berry*, 221 So.3d at 968 ("Aggravated rape is an offense for which 'punishment is necessarily confinement at hard labor.'") (quoting La. C. Cr. P. art. 782). Therefore, Louisiana law did not require that the verdict be unanimous at the time of Petitioner's conviction in 2014. *Id.*

In April 2020, the United States Supreme Court held that "the Sixth Amendment Right to a Jury trial—as incorporated against the States by way of the Fourteenth Amendment—requires a unanimous verdict to convict a defendant of a serious offense." *Ramos v. Louisiana*, 140 S. Ct. 1390, 13904 (2020). The Court later clarified that *Ramos* does not apply retroactively on federal collateral review.[2] *Edwards v. Vannoy*, 141 S. Ct. 1547, 1551–52 (2021). Therefore, Petitioner's conviction by a 11-1 vote of the jury did not violate the Sixth Amendment.[3]

Accordingly, this claim fails.

### b. *Invalid/Improper Indictment*

Petitioner alleges that his indictment was "invalid/improper" because he was incorrectly indicted for Aggravated Rape in violation of the Constitution's ex-post-facto prohibition.[4] [doc. #5, p. 7]. Petitioner argues that he should have been charged with Aggravated Oral Sexual Battery under Louisiana Revised Statute 14:43.4. *Id.* La. R.S. 14:43.4 was repealed on August 15, 2001,

---

[2] The Louisiana Supreme Court has held that *Ramos* does not apply retroactively on state collateral review. *State v. Reddick*, 2021-01893 (La. 10/21/22), 251 So.3d 273, 277.

[3] In his supplemental brief, Petitioner argues that the Supreme Court's decision in *Griffith v. Kentucky*, 479 U.S. 314 (1987), requires that the unanimous jury requirement be applied retroactively. This is incorrect. As the Supreme Court explained in *Edwards*, "A new rule of criminal procedure applies to cases on *direct* review, even if the defendant's trial has already concluded." *Edwards*, 141 S. Ct. at 1554 (citing *Griffith*, 479 U.S. at 328). However, "under the habeas corpus statute as interpreted by [the Supreme Court], a new rule of criminal procedure ordinarily does not apply retroactively to overturn final convictions on federal *collateral* review." *Id.* (emphasis added).

[4] To the extent that Petitioner argues that the indictment was insufficient, "the sufficiency of a state indictment is not a matter of federal habeas relief unless it can be shown that the state indictment is so defective that it deprives the state court of jurisdiction." *Wood v. Quarterman*, 503 F.3d 408, 412 (5th Cir. 2017). The state appellate court denied Petitioner's claim raising the impropriety of the indictment. *Berry*, 221 So.3d at 987. Thus, Petitioner is foreclosed from challenging the sufficiency of the indictment on federal habeas review. *Schermerhorn v. Davis*, No. 18-11136, 2019 WL 11788789, at *1 (5th Cir. June 19, 2019). However, the Court may consider Petitioner's claim to the extent that he alleges the indictment violated the Ex Post Facto Clause of the Constitution.

and the conduct prohibited therein was simultaneously prohibited as an act of "aggravated rape" under Louisiana Revised Statutes 1441 and 42. *State v. Quang T. Do.*, 13-290 (La. App. 5 Cir. 11/19/13), 130 So.3d 377, 390–91.

In response, the State argues that the indictment was proper because Petitioner committed the offense between August 20, 2001, and May 22, 2003—after the prohibited conduct became "aggravated rape" effective August 15, 2001.[5] [doc. #24-1, p. 8].

On appeal, the state court concluded that the claim lacked merit because Petitioner was charged under the aggravated rape statute and not the aggravated oral sexual battery statute. *Berry*, 221 So.3d at 987. The court also noted that, during the relevant dates contained in the bill of particulars—August 20, 2001, and May 22, 2003—La. R.S. 14:42 defined aggravated rape to include oral intercourse committed against a child under the age of thirteen. *Id.*

The state appellate court's determination is entitled to deference. *Burt v. Titlow*, 571 U.S. 12, 18–19 (2013) ("[Section 2254] likewise imposes a highly deferential standard for reviewing claims of legal error by state courts: [a] writ of habeas corpus may issue only if the state court's decision was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by this Court." (internal citations and punctuation marks omitted)).

---

[5] The State acknowledged that the original indictment alleged that the offense occurred between January 1, 2000, and December 31, 2003. [doc. #24-1, p. 8]. Later, however, in its December 11, 2015, response to Defendant Berry's motion for bill of particulars, the State alleged that the offense occurred between July 10, 2001, and July 9, 2003. [doc. #24-5, p. 55]. The Defendant objected to the State's response, and the trial court ordered the State to file another response with a more specific date range. *Berry*, 221 So.3d at 985. In response, the State alleged that the offense occurred between August 20, 2001, and May 22, 2003. [doc. #24-5, p. 56]. On appeal, Petitioner argued that the trial court erred by permitting the State to amend the time frame alleged for the aggravated rape. *Berry*, 221 So.3d at 985. The state appellate court rejected Petitioner's argument, finding that the State utilized information obtained from the victim to provide Petitioner with the most specific time range available for the aggravated rape. *Id.*

12

The "clearly established Federal law" at issue here is the Constitution's Ex Post Facto Clause. A statute violates the Ex Post Facto Clause if it "punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time when the act was committed." *Collins v. Youngblood*, 497 U.S. 37, 43 (1990) (quoting *Beazell v. Ohio*, 269 U.S. 167, 169–70 (1925)). Thus, "[a] law violates the Ex Post Facto Clause if it retroactively imposes punishment for an act that is greater than that prescribed when the act was committed." *Brown v. Davis*, No. 3:17-cv-213, 2017 WL 5952713, at *3 (S.D. Tex. Nov. 28, 2017) (citing *Weaver v. Graham*, 450 U.S. 24, 28–29 (1981)).

Petitioner was tried and convicted under the aggravated rape statute, which, as discussed above, defined aggravated rape to include oral intercourse committed against a child under the age of thirteen, and was effective at the time Petitioner raped J.B., who was under the age of thirteen. As applied to Petitioner, the aggravated rape statute did not punish an act previously committed that was innocent when done, enhance Petitioner's punishment for the crime after its commission, or deprive Petitioner of any defense available when the act was committed. Further, there is no evidence in the record, and Petitioner offers no argument, that the state court's determination that Petitioner's claim lacked merit was contrary to federal law.

Accordingly, this claim fails.

## Conclusion

For the foregoing reasons,

**IT IS RECOMMENDED** that the Court **DENY** Petitioner Bradley Wayne Berry's claims and **DISMISS** his petition, **WITH PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Fed. R. Civ. P. 72(b), the parties have **fourteen (14)** days from service of this Report and Recommendation to file specific, written objections with the Clerk of Court. A party may respond to another party's objections within **fourteen (14) days** after being served with a copy thereof. A courtesy copy of any objection or response or request for extension of time shall be furnished to the District Judge at the time of filing. Timely objections will be considered by the District Judge before he makes a final ruling.

**A PARTY'S FAILURE TO FILE WRITTEN OBJECTIONS TO THE PROPOSED FINDINGS, CONCLUSIONS, AND RECOMMENDATIONS CONTAINED IN THIS REPORT WITHIN FOURTEEN (14) DAYS FROM THE DATE OF ITS SERVICE SHALL BAR AN AGGRIEVED PARTY, EXCEPT ON GROUNDS OF PLAIN ERROR, FROM ATTACKING ON APPEAL THE UNOBJECTED-TO PROPOSED FACTUAL FINDINGS AND LEGAL CONCLUSIONS ACCEPTED BY THE DISTRICT JUDGE.**

In Chambers, at Monroe, Louisiana, on this 7th day of March, 2023.

KAYLA DYE MCCLUSKY
UNITED STATES MAGISTRATE JUDGE